# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

QUENTIN ODELL MATHIS,     )
                              )
          Plaintiff,     )
                              )
        v.            )     1:15CV215
                              )
J.A. MILEM, et. al.,        )
                              )
         Defendants.    )

## ORDER, MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court upon Defendants Steven L. Hopkins and John L. Kempf's motion for summary judgment. (Docket Entry 30.) Also before the Court is Plaintiff Quentin Mathis's letter document, which in part, appears to be a motion for an extension of time to obtain discovery. (Docket Entry 43.) All matters are ripe for disposition. For the following reasons, the Court will deny Plaintiff's motion for an extension of time to obtain discovery, and recommend that Defendants' motion for summary judgment be denied.

## I. PROCEDURAL BACKGROUND

On March 11, 2015, Plaintiff, a *pro se* prisoner, filed a Complaint asserting that Defendants[1] used excessive force upon Plaintiff after conducting a routine and scheduled search at the Rowan County Detention Center. (*See generally* Compl., Docket Entry 2.) Defendants Hopkins and Kempf thereafter filed an Answer (Docket Entry 16) and the Court

---

[1] A third Defendant, J.A. Milem, has not been served in this matter.

entered a discovery order in this matter. (Docket Entry 18.) The completion date of all discovery was October 10, 2016. (*Id.*) Plaintiff subsequently filed an Amended Complaint which was stricken for failure to comply with the Local Rules and Federal Rules of Civil Procedure. (Text Order dated 9/12/2016; *see also* Docket Entry 21.) In light of Plaintiff's *pro se* prisoner status, the Court did allow Plaintiff additional time to file a proper motion for leave to amend his Complaint. (Text Order dated 9/12/2016.) Plaintiff filed subsequent motions for leave to amend, and for an order compelling discovery. (Docket Entries 23, 24.) On November 8, 2016, Defendants Hopkins and Kempf filed their motion for summary judgment. (Docket Entry 30.) Thereafter the Court ruled upon Plaintiff's motions. (Text Order dated 12/21/2016.) In particular, the Court ordered that Defendants respond to Plaintiff's request for certain documentation and the video of the alleged assault. (*Id.*) As to interrogatory requests, the Court further instructed Plaintiff to submit to Defendants "a one (1) page document clarifying exact interrogatory questions Plaintiff seeks to ask Defendants." (*Id.*) It further stated that "Plaintiff shall have until Wednesday, January 11, 2017 to submit those questions." (*Id.*)

On January 26, 2017, Defendants filed a status report indicating their compliance with the Court's December 2016 Order. (Docket Entry 38.) Defendants also informed the Court that they never received a clarification of the interrogatory questions from Plaintiff. (*Id.*) Shortly thereafter, Defendants received Plaintiff's interrogatory requests, and filed objections for untimeliness and Plaintiff's failure to comply with the Court's instructions. (Docket Entry 39.) Plaintiff filed a response indicating that he filed the interrogatories with the Court before

the January 11, 2017 deadline. (Docket Entry 40.) However, no such record is apparent from the Court's record. Defendants thereafter reasserted their motion for summary judgment (Docket Entry 42) and Plaintiff filed a response seeking, in part, additional time to obtain discovery responses. (Docket Entry 43.) The Court will deny Plaintiff's request. Plaintiff failed to comply with the Court's previous Order in that he failed to timely submit to Defendants "a one (1) page document clarifying exact interrogatory questions Plaintiff seeks to ask Defendants." (Text Order dated 12/21/2016.) Moreover, Plaintiff's lack of compliance is prejudicial to Defendants and also hinders the Court in its efforts to dispose of this matter in the most efficient manner. As such, in making the recommendation herein upon Defendants' motion for summary judgment, the Court will consider evidence now before the Court.

## II. FACTUAL BACKGROUND

In his Complaint, Plaintiff asserts that on December 29, 2013, Defendant Kempf entered the detention center dorm at approximately 9:00am to conduct a routine search. (*See generally* Compl., Docket Entry 2 at 5.) After all detainees were asked to move to the front of the dorm, Defendant Kempf "singled out" Plaintiff and asked him what was in his pocket. (*Id.*) Plaintiff responded, "My radio, why what's going on?" (*Id.*) Defendant Kempf then instructed Plaintiff to place his radio on his bed and to move back to the front of the dorm. (*Id.*) Defendant Kempf told all detainees that no personal items could be taken from the dorm. (*Id.*) Plaintiff then asked if the detainees were leaving the dorm and Defendant Kempf allegedly replied, "Shut up! And follow the order!" (*Id.*) Plaintiff proceeded to remove his

shower shoes and put on his tennis shoes, at which point he was approached by Defendant Kempf who yelled, "Take them off!" (*Id.*) Plaintiff stated that no policies prohibited him from wearing his shoes, and Defendant Kempf responded, "Ok, get in line." (*Id.*)

Plaintiff alleges that the detainees were then taken to the storage room behind the control room for approximately thirty minutes while the dorm search was executed. (*Id.*) Defendant Kempf returned to the storage room and told Plaintiff and another inmate (Gibson) to step into the hallway. (*Id.*) Plaintiff followed behind inmate Gibson and stepped into the hallway where another officer, Kevin M. Holshouser ("Holshouser"), was also standing. (*Id.*) Defendant Kempf then informed Plaintiff that he was being moved to another unit and that he would find out why he was being moved "once he got there." (*Id.*) Plaintiff then asked Officer Holshouser what was going on and Plaintiff was told that he was being "locked down for contraband." (*Id.*) Plaintiff asserts that without warning, Defendant Kempf then shoved Plaintiff, and "grabbed [Plaintiff] by the arm and throat area, hitting [Plaintiff] in the jaw [and] face area." (*Id.* at 6.) Plaintiff tried to defend himself. (*Id.*) Defendant Kempf tackled Plaintiff to the floor, "punched [Plaintiff] in the face and rib area, [and] squeezed [Plaintiff] in his lower private parts causing an instant pain." (*Id.*)

Plaintiff further alleges that he laid "flat on the ground with his hands placed on his head, while asking officers to stop the assault by [Defendant Kempf]." (*Id.*) Defendant Hopkins "started shocking [Plaintiff] repeatedly with the Taser gun while being placed in handcuffs." (*Id.*) Plaintiff asserts that Defendant Hopkins shocked Plaintiff three more times with the Taser gun while Plaintiff was in handcuffs. (*Id.*) Defendant Kempf also "placed his

knee in [Plaintiff's] head applying pressure with his entire body weight pressing down on the temple area of [Plaintiff's] head causing more pain." (*Id.*) According to Plaintiff, another officer arrived and told Defendant Kempf to get off Plaintiff. (*Id.*) Defendant Kempf complied, then started pulling Plaintiff's hair. (*Id.*) Defendant Kempf received further orders to move away from Plaintiff before he ceased use of excessive force. (*Id.*)

Plaintiff thereafter filed a "force report" and requested to file a complaint against Defendants Kempf and Hopkins. (*Id.*) Plaintiff states that the grievance was not located in his Inmate File when he asked for a copy of it. (*Id.*) On January 3, 2014, Plaintiff requested witnesses for his disciplinary hearing surrounding the incident. (*Id.* at 7.) Plaintiff's hearing was held several days later with two of the three witnesses which Plaintiff requested. (*Id.*) Plaintiff indicated that he wanted all of his witnesses present. (*Id.*) Plaintiff thereafter filed a grievance with regard to the hearing. (*Id.*) He appealed the initial response for his grievance, but did not receive any further response. (*Id.*) Also, Plaintiff was asked to sign a property sheet, but refused because he stated that it was inaccurate. (*Id.*) Once Plaintiff returned from the segregation unit, Plaintiff noticed some of his items missing. (*Id.*) Plaintiff also wrote a grievance about his missing property and alleges that all of his items were never recovered. (*Id.*) Lastly, Plaintiff complained of his inability to send or receive mail while in the segregation unit, which is the policy at the Rowan County Detention Center. (*Id.*) Plaintiff seeks a declaration that his constitutional rights have been violated, an injunction against Defendant J.A. Milem, and compensatory and punitive damages against all Defendants. (*Id.* at 4.)

In support of their motion for summary judgment, Defendants have submitted their

affidavits along with the affidavits and declarations of Rowan County Detention Officers Holshouser and Mandy D. Tew, and Jail Nurse Tammy Yon. (John L. Kempf Aff., Docket Entry 31-2; Steven L. Hopkins Aff., Docket Entry 31-3; Kevin M. Holshouser Aff., Docket Entry 31-4; Mandy D. Tew Decl., Docket Entry 31-5; Tammy Yon Aff., Docket Entry 31-6.) Beyond the fact that the officers were conducting a routine search of the dorm on December 29, 2013, the parties differ in opinion as to what happened during the incident. Defendants Kempf and Hopkins, and Officer Holshouser all assisted in conducting the search of the dorm. (Kempf Aff. ¶ 3; Hopkins Aff. ¶ 3; Holshouser Aff. ¶ 3.) Defendant Kempf states that Plaintiff "became verbally argumentative with [officers], telling [them] that [their] inspection was 'bullshit' and that [they] had no right to wake the prisoners up to perform the inspection." (Kempf Aff. ¶ 3.) The prisoners, including Plaintiff, were removed from the area and placed in the Day Room behind the Control Room until the search was complete. (Kempf Aff. ¶ 3; Holshouser Aff. ¶ 3; Hopkins Aff. ¶ 3.) During the course of the search, Plaintiff and another prisoner were both found to be in possession of contraband. (Kempf Aff. ¶ 3; Holshouser Aff. ¶ 3; Hopkins Aff. ¶ 3.) Plaintiff was in possession of a salt packet and a quarter. (Kempf Aff. ¶ 3.)

Plaintiff and the other prisoner were removed from the secured room and informed by Defendant Kempf that they were being moved to Pod 2 (administrative segregation). (Kempf Aff. ¶ 4; Holshouser Aff. ¶ 4; Hopkins Aff. ¶ 4.) At this point, Officer Tew was also assisting the other officers, and witnessed Defendant Kempf tell the prisoners that they were being moved to another unit. (Tew Decl. ¶ 3.) Plaintiff refused to move and asked why he

was being locked down. (Kempf Aff. ¶ 4; Holshouser Aff. ¶ 4; Hopkins Aff. ¶ 4, Tew Decl. ¶ 3.) Defendant Kempf responded that he would tell Plaintiff after he arrived at Pod 2. (Kempf Aff. ¶ 4; Holshouser Aff. ¶ 4; Hopkins Aff. ¶ 4, Tew Decl. ¶ 3.) Plaintiff continued to refuse Defendant Kempf's orders and Officer Holshouser then told Plaintiff that he was being moved for possession of contraband. (Holshouser Aff. ¶ 4; Hopkins Aff. ¶ 4.) Plaintiff continued to refuse the officers' commands, and Defendant Kempf then "took [Plaintiff] by the arm to guide him to Pod 2 and ordered him to move along." (Kempf Aff. ¶ 4; *see also* Holshouser Aff. ¶ 4; Hopkins Aff. ¶ 4, Tew Decl. ¶ 3.) Defendant Kempf asserts that he then reached for Plaintiff's shoulder, "but [Planitiff] was able to move away." (Kempf Aff. ¶ 4.) Defendant Kempf reached towards his belt to retrieve his Taser, but was punched in the left side of his face by Plaintiff. (Kempf Aff. ¶ 4.) The other officers also observed Plaintiff pulling away from Defendant Kempf and suddenly punching him in the face. (Holshouser Aff. ¶ 4; Hopkins Aff. ¶ 4, Tew Decl. ¶ 4.)

Plaintiff then pushed Defendant Kempf backwards, knocking Defendant Hopkins against the wall. (Kempf Aff. ¶ 4; Hopkins Aff. ¶ 4; Tew Decl. ¶ 4.) Officer Holshouser then grabbed Plaintiff around his waist, placed his right foot behind Plaintiff's foot, and threw Plaintiff over his right shoulder and onto the floor. (Holshouser Aff. ¶ 5; Kempf Aff., ¶ 5; Hopkins Aff. ¶ 5; Tew Decl. ¶ 4.) Officer Holshouser grabbed Plaintiff's arm and attempted to pull it behind his back so that the officers could handcuff him. (Holshouser Aff. ¶ 5.) However, Officer Holshouser was unable to gain control of Plaintiff's arm. (*Id.*) During this time, Defendant Kempf was underneath Plaintiff on the floor, and Defendant Kempf

repeatedly ordered Plaintiff to stop biting him. (Kempf Aff. ¶ 6; Holshouser Aff. ¶ 5.) As Defendant Kempf freed his right hand (both hands were pinned between his body and Plaintiff's body), Plaintiff continued to bite Defendant Kempf. (Kempf Aff. ¶ 6.) Defendant Kempf then used his right arm to push Plaintiff's head back, and Plaintiff bit Defendant Kempf again. (*Id.*) Defendant Kempf admits that he grabbed Plaintiff by the hair to stop him from biting Defendant Kempf and spitting at him. (*Id.* ¶ 7.)

Also during this time, Officer Holshouser yelled for Defendant Hopkins to use his Taser in order to gain control of Plaintiff. (Holshouser Aff. ¶ 6.) Defendant Hopkins deployed his Taser in drive-stun mode (direct contact for pain compliance only) to Plaintiff's legs. (Hopkins Aff. ¶ 5; Holshouser Aff. ¶ 6; Tew Decl. ¶ 5.) Defendant Hopkins ordered Plaintiff to place his hands behind his back, and Plaintiff begin to swipe at the Taser and kick at Defendant Hopkins. (Hopkins Aff. ¶ 5.) Defendant Hopkins applied several more drive stuns to Plaintiff, and the officers were ultimately able to gain control of Plaintiff and secure his wrists with handcuffs. (Holshouser Aff. ¶ 6; Hopkins Aff. ¶ 5; Tew Decl. ¶ 5.) Defendant Hopkins asserts that he did not use his Taser against Plaintiff after he was handcuffed. (Hopkins Aff. ¶ 5.)

Defendant Kempf and Officer Holshouser assisted Plaintiff to his feet and escorted him to Pod 2, where they placed him in a cell. (Kempf Aff. ¶ 8; Holshouser Aff. ¶ 7.) Due to Plaintiff's belligerent attitude, Plaintiff remained in handcuffs until he eventually calmed down. (Holshouser Aff. ¶ 7; Hopkins Aff. ¶ 6.) Plaintiff did not complain of any injuries to the officers. (Kempf Aff. ¶ 8; Holshouser Aff. ¶ 8; Hopkins Aff. ¶ 7; Tew Decl. ¶ 7.) Plaintiff

was promptly evaluated by Nurse Yon, who determined that Plaintiff had not suffered any significant injuries. (Yon Decl. ¶ 3; Holshouser Aff. ¶ 8.) Plaintiff did have a small abrasion to his lower lip and a small bruise in the middle of his forehead. (Yon Decl. ¶ 3.) Neither required treatment. (*Id.*) X-rays were taken of Plaintiff's ribs and right hand which returned negative for fractures or injuries. (*Id.* ¶ 4.) Plaintiff only received Ibuprofen before returning to his cell. (*Id.*) Defendant Kempf was also seen by Nurse Yon. (*Id.* ¶ 5.) He was bleeding from wounds under his right eye and cheek. (*Id.* ¶ 5; *see also* Kempf Aff. ¶ 9; Tew Decl. ¶ 7; Hopkins Aff. ¶ 8.) Nurse Yon disinfected the wounds, but additional care was necessary. (Yon Decl. ¶ 5.) Defendant Kempf was then sent to the local urgent care facility for further treatment. (*Id.*; Kempf Aff. ¶ 9.)

On April 30, 2015, Plaintiff was convicted in Rowan County Superior Court of the offenses of Assault Inflicting Serious Injury upon a Law Enforcement Officer (Defendant Kempf), a Class F felony, and Assault upon a Law Enforcement Officer (Defendant Hopkins), a Class A1 misdemeanor (these charges being consolidated for judgment as Docket # 13057672), in connection with the December 29, 2013 incident referenced in Plaintiff's Complaint. (Kempf Aff. ¶ 10; Hopkins Aff. ¶ 9.)

Defendants Kempf and Hopkins also provided a CD-ROM containing recorded video surveillance camera footage from the incident. (Kemp Aff. Ex. B; *see also* Docket Entry 32.) Defendant Kempf attests that he is the male officer in the video that is punched by Plaintiff and subsequently on the floor underneath Plaintiff. (Kempf. Aff. ¶ 12.) Defendant Hopkins states that he is the short, thin male officer in the video without a baseball cap who can be

seen crouching on the floor behind Officer Holshouser administering Taser shocks and later handcuffing Plaintiff. (Hopkins Aff. ¶ 12.) Officer Holshouser states that he is the officer wearing the baseball cap. (Holshouser Aff. ¶ 10.) Officer Tew states that she is the female officer placing the clipboard on the floor and thereafter responding to the struggle between Plaintiff and the other officers. (Tew Decl. ¶ 9.) Defendants Kempf and Hopkins, and Officer Holshouser indicate that Plaintiff is the African-American prisoner with "dreadlock" style hair. (Kempf Aff. ¶ 12; Hopkins Aff. ¶ 12; Holshouser Aff. ¶ 10.)

The Court's viewing of the hallway video footage[2] suggests the following: At the start of the footage, three male officers (presumably Kempf, Holshouser, and Hopkins) are seen entering from the right side of the hallway and walking across to an adjacent hallway/room.[3] (Video timestamp 00:02-9.) A female officer (presumably Tew) then enters the hallway from the right side with a clipboard in her right hand and proceeds to walk across to the adjacent hallway/room. (Video timestamp 00:17-24.) She remains partially visible for several seconds, then comes back into plain view of the video. (Video timestamp 00:24-38.) Officer Tew remains facing the adjacent hallway/room for several seconds. (Video timestamp 00:38-52.) A few seconds later, a prisoner enters the main hallway from the adjacent area, and Officer Tew is seen walking towards the camera. (Video timestamp 00:53-01:02.)

As Officer Tew walks back towards the prisoner, another inmate (presumably Plaintiff) suddenly appears from the adjacent hallway/room, backing up into the main hallway. (Video

---

[2] The video footage is approximately 2 minutes and 54 seconds. The video recording is without sound.
[3] The adjacent hallway/room is not in the view of the camera.

timestamp 01:03-7.) The video suggests that one of the officer's (Defendant Kempf's) right hand is outstretched towards Plaintiff's upper chest/shoulder area as Plaintiff is walking backwards into the hallway. (Video timestamp 01:07-8.) As Defendant Kempf's hands move down towards his belt area, Plaintiff suddenly lunges at Defendant Kempf and strikes him. (Video timestamp 01:07-10.) At this point, both Defendant Kempf and Plaintiff are out of the view of the camera (in the area of the adjacent hallway/room). (Video timestamp 01:10.) Officer Tew then runs towards the adjacent hallway/rooms and is momentarily out of the view of the camera. (Video timestamp 01:11-12.) Immediately thereafter, Officer Tew returns to the main hallway, and the video footage suggests that a struggle ensues between Plaintiff and the officers. (Video timestamp 01:11-34.) It appears that one officer is beneath Plaintiff, and two additional officers are attempting to get control of Plaintiff. (Video timestamp 01:16-28.) At some point, it appears that a Taser is deployed, and one officer (presumably Defendant Hopkins) is then seen placing something back in his belt. (Video timestamp 01:22-39.) At this point, Plaintiff appears to be lying on his stomach as the officers are attempting to secure Plaintiff. (Video timestamp 01:40-02:04.) Several seconds later, it appears that Plaintiff is assisted off the floor by two officers and escorted away in handcuffs. (Video timestamp 02:27-40.)

In opposition to the motion for summary judgment, Plaintiff has also filed several declarations and affidavits: Plaintiff's affidavit, the declaration of Darius Smotherson, and the declaration of Kevin Toomer. (Mathis Aff., Docket Entry 36-2; Smotherson Decl., Docket Entry 36-3; Toomer Decl., Docket Entry 36-4.) Plaintiff's affidavit essentially reasserts the

11

statement of claims as set forth in Plaintiff's Complaint. (*See* Mathis Aff., Docket Entry 36-2.) According to Toomer's declaration, he was present on December 29, 2013, when the routine dorm search took place. (Toomer Decl., Docket Entry 36-4 at 2.) Toomer states that Defendant Kempf was "yelling and being very aggressive towards [Plaintiff] over his shoes and radio." (*Id.*) When the prisoners were placed in the room behind the Control room, Toomer states that he could see Defendant Kempf through the window. (*Id.*) He saw the officers go to the booking area, and Toomer stated that Defendant Kempf was "popping his knuckles and rotat[ing] his neck and shaking his arms like he was getting loose before exercising." (*Id.*) Defendant Kempf then came into the storage room to call Plaintiff and another inmate into the hallway. (*Id.*) Defendant Kempf shut the door of the storage room. (*Id.*) Toomer saw Plaintiff and Officer Holshouser talking, then "Kempf shoved [Plaintiff] in the upper shoulder area and in the jaw area." (*Id.*) Toomer witnessed Plaintiff and Defendant Kempf fighting each other. (*Id.*) Toomer further states that Officer Holshouser "grab[bed] them both and pull[ed] them to the floor." (*Id.*) At that point, Defendant Hopkins started shocking Plaintiff and continued to use the Taser after Plaintiff had submitted to the officers. (*Id.*) Toomer believes that Defendant Hopkins shocked Plaintiff at least nine times and continued shocking him while officers were handcuffing Plaintiff. (*Id.*)

According to Darius Smotherson's declaration, he witnessed Plaintiff being placed in a cell in Pod 2. (Smotherson Decl., Docket Entry 36-3 at 2.) Smotherson, an inmate, states that Plaintiff remained in the cell for three hours in handcuffs before an officer removed them. (*Id.*) He further states that Plaintiff was in pain, had several marks on his face, and "some of

his [dreads] where ripped out in the front part of his head." (*Id.*) The next day, Smotherson noticed that Plaintiff was swollen and reported it to the officer on duty. (*Id.*) Smotherson told Plaintiff that he would send mail to his family in Smotherson's name since the detention center prohibited inmates on lockdown from sending or receiving mail. (*Id.* at 3.) Smotherson received mail from Plaintiff's family. (*Id.*)

Plaintiff has also submitted several documents, including a Notice of Disciplinary Restrictions which indicates that inmates may not send or receive mail while in the administrative segregation unit. (Docket Entry 36-5.) Additionally, Plaintiff submitted a copy of an Inmate Request Form where Plaintiff sought to file a complaint against Defendants Kempf and Hopkins. (Docket Entry 36-6.) Plaintiff also filed a Lock Down Notification Form and several documents related to his disciplinary hearing. (Docket Entries 36-7, 36-8.)

## III. DISCUSSION

Defendants Kempf and Hopkins have moved for summary judgment in this matter.[4] (Docket Entries 89, 117.) Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.

---

[4] In his opposition brief to Defendants Kemp and Hopkins' motion for summary judgment, Plaintiff also states that he "moves for summary judgment against Defendant J.A. Milem." (Docket Entry 36 at 1.) The Court notes that any such motion is untimely and should not be considered. Moreover, Defendant J.A. Milem has not been served in this action; thus, a motion for summary judgment against him is improper. *Owens v. Bulter*, No. 5:15-CT-3033-FL, 2015 WL 1824639, at *3 (E.D.N.C. Apr. 22, 2015) (unpublished) (denying plaintiff's motion for summary judgment as premature because "defendants have not yet been served with a copy of the summons and complaint"); *Scible v. Steward*, No. 1:08CV100, 2009 WL 87427, at *15 (N.D.W. Va. Jan. 13, 2009) (unpublished) ("At the time the plaintiff filed his motion for summary judgment, the defendants had not yet been served with a copy of the complaint and no responsive pleading had been filed. Accordingly, the plaintiff's motion was filed prematurely.").

Civ. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick Cty. Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination, the Court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *Anderson*, 477 U.S. at 248-49. Here, Plaintiff is a *pro se* litigant; thus, his pleadings are to be liberally construed. *Graham v. Geneva Enters., Inc.*, 55 F. App'x 135, 136 (4th Cir. 2003).

Defendants here seek to rely, in part, upon video evidence in support of their motion

for summary judgment. "[W]hen a video 'quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007)); *see also Bostic v. Rodriguez*, 667 F. Supp. 2d 591, 605 (E.D.N.C. 2009) (citation omitted) ("[T]o the extent plaintiffs' recollection and the video are inconsistent, the video 'speak[s] for itself,' and the court considers the facts as displayed in the video."). Nevertheless, "to the extent that the videos are unclear and ambiguous, the Court must adopt [P]laintiff's version of events for purposes of [Defendants' motion]." *Glascoe v. Sowers*, No. CIV.A. ELH-11-2228, 2013 WL 5330503, at *5 (D. Md. Sept. 20, 2013) (unpublished), *aff'd*, 570 F. App'x 344 (4th Cir. 2014). Moreover, this Court should not "reject a plaintiff's account on summary judgment whenever documentary evidence, such as a video, offers [only] *some* support for a governmental officer's version of events." *Witt*, 633 F.3d at 276 (emphasis in original).

## Excessive Force

A review of the evidence indicates that there is a genuine issue of material fact as to whether Defendants used excessive force during the incident in question. Excessive force of a pretrial detainee is governed by the Due Process Clause of the Fourteenth Amendment, which prohibits before conviction "the use of excessive force that amounts to punishment." *Sawyer v. Asbury*, 537 Fed. Appx. 283, 290 (4th Cir. 2013) (citation omitted). Courts use an objective reasonableness standard to analyze excessive force claims under the Fourteenth Amendment. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (concluding that "the

appropriate standard for [assessing] a pretrial detainee's excessive force claim is solely an objective one"). "Under this standard, the officer's 'underlying intent or motivation' is irrelevant; rather the focus is on 'whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force.'" *Oliver v. Baity*, 208 F. Supp. 3d 681, 695 (M.D.N.C. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001)); *see also Duff v. Potter*, 665 F. App'x 242, 244 (4th Cir. 2016) (unpublished) ("Because the standard is an objective one, the court is not concerned with the officers' motivation or intent."). Thus, "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley*, 135 S. Ct. at 2473-74. The following factors are considered to determine the reasonableness or unreasonableness of the force used:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* at 2473. A court must determine objective reasonableness "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* at 2473.

Here, the evidence is unclear as to whether Defendants' use of force was objectively reasonable. The conflicting affidavits present two different versions of the events that took place, and the video evidence fails to provide further clarity. The Court will address Defendant

16

Kempf's conduct first. As to the first *Kingsley* factor (the relationship between the need for the use of force and the amount of force used), this factor weighs in favor of Plaintiff. Plaintiff's version of events suggests that Defendant Kempf was the initial aggressor, while Defendants' affidavits suggests otherwise. The video evidence does show Plaintiff as he strikes Defendant Kempf. However, according to Plaintiff, he did so in self-defense. The events transpiring in the adjacent hallway/room prior to Plaintiff entering the main hallway are absent from the video camera. Viewed in light most favorable to Plaintiff, the use of force Plaintiff describes — shoving, grabbing throat, punching, and squeezing Plaintiff's private parts — would be wholly out of proportion with the need for force to address a detainee who was only asking questions about why he was being sent to the segregation unit. *Sawyer*, 537 F. App'x at 292 (citation omitted) ("No law enforcement officer is entitled to use force against someone based on that person's verbal statements alone."). Indeed, if video evidence blatantly contradicted these allegations, the outcome of this matter would be different. However, at the junction, the Court only has before it conflicting versions of the events that took place, and a video that captures only a portion of the scene. Thus, this factor weighs in favor of Plaintiff.

The second *Kingsley* factor, the extent of Plaintiff's injury, weighs slightly in favor of Defendant Kempf. Plaintiff alleges that he suffered a serious amount of hair loss, other physical injury and emotional distress as a result of Defendant Kempf's actions. Also, Inmate Smotherson's affidavit in support of Plaintiff's argument further notes observation of marks on Plaintiff's face and missing hair. The video is not clear enough to depict Plaintiff's injuries;

17

however, it appears Plaintiff did walk away from the scene (escorted by prison officials). Moreover, Plaintiff was seen by Nurse Yon immediately following the altercation and other than a small abrasion to Plaintiff's lip and a bruise on his forehead, no other physical injuries were observed. Neither Plaintiff's abrasion or bruise required additional care or treatment. The relatively minor injuries could be indicative of the actual force used by Defendant Kempf. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (discussing excessive force under the Eight Amendment and finding that "[t]he extent of injury may also provide some indication of the amount of force applied"). Thus, this factor weighs in favor of Defendant Kempf. *Greene v. Cty. of Durham Office of the Sheriff Dep't*, No. 1:14-CV-153, 2016 WL 4507355, at *10 (M.D.N.C. Aug. 26, 2016) (unpublished) ("[T]he record reflects that these injuries were relatively minor, so this factor weighs in favor of the defendants."); *Haizlip v. Alston*, No. 1:14CV770, 2016 WL 4184426, at *12 (M.D.N.C. Aug. 5, 2016) (unpublished) (weighing second *Kingsley* factor in favor of defendants where "the Amended Complaint d[id] not allege that the abrasions required medical treatment"); *see also Garcia v. Gardner*, No. CV 14-5357, 2015 WL 6123067, at *4 (W.D. Ark. Aug. 21, 2015) (unpublished) ("The minimal injuries suffered by [plaintiff], a reddened area on his forehead and a small abrasion on his left nostril, even if [the court] assume[s] these minor injuries were caused by the conduct of the deputies …, belies the use of any excessive force."), *report and recommendation adopted,* No. 5:14-CV-05357, 2015 WL 6125918 (W.D. Ark. Oct. 16, 2015) (unpublished).

When viewed in the light most favorable to Plaintiff, the remaining *Kingsley* factors, "any effort made by the officer to temper or to limit the amount of force; the severity of the

security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting," 135 S. Ct. at 2473, all weigh in favor of Plaintiff. Plaintiff here depicts Defendant Kempf as the initial aggressor; thus, any security problem or threat perceived by Defendant Kempf would have been minimal or nonexistent. Additionally, if Plaintiff's version of the events is true, it is bare evidence of initial active resistance as Plaintiff was simply inquiring about his segregation unit placement at the time he was allegedly first struck by Defendant Kempf. Here again, absent from the video footage is what transpired in the adjacent hallway/room which is material in this matter. In sum, the majority of the *Kingsley* factors weigh in Plaintiff's favor. Thus, Defendant Kempf should not be entitled to summary judgment.

Summary judgment should also be denied as to Defendant Hopkins. Defendant Hopkins admits to using the Taser on Plaintiff, but denies further use of the Taser after Plaintiff was handcuffed. To the contrary, Plaintiff asserts that Defendant Hopkins continuously applied the Taser while Plaintiff was being handcuffed and after Plaintiff was placed in handcuffs. The video footage does depict what appears to be a Taser (Video timestamp 01:22-39), however the quality of the video and lack of sound precludes a clear determination as to what extent it was used, and when it was used (before and/or after Plaintiff is handcuffed).[5] Thus, "[i]t is difficult to decipher from reviewing the video the true sequence of events." *Witt*, 633 F.3d at 277; *see also Rivers v. Burnette*, No. CIV.A. 4:13-01914, 2015 WL

---

[5] It is clear from the video that Plaintiff was not tasered after officer assisted him to his feet and escorted him from the area.

535623, at *7 (D.S.C. Feb. 10, 2015) (unpublished) ("Although the sequence of events captured in the video and audio can certainly be argued to support the defendants' position, they do not disprove the plaintiff's claims or foreclose the possibility that a reasonable jury could believe the plaintiff's account.").

Considering the *Kingsley* factors, there is a genuine issue of material fact as to whether Defendant Hopkins' actions were objectively reasonable. The Court notes that Defendant Hopkins deployed the Taser in drive stun mode, not incapacitating mode. *See De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 896 n.5 (8th Cir. 2014) ("Deploying the [T]aser in drive stun mode means that an officer removes the cartridge from the [T]aser and applies the [T]aser so as to make direct contact with the subject's body. When the [T]aser is in drive stun mode, it only causes discomfort and does not incapacitate the subject."). Moreover, there appears to be no evidence of physical injury to Plaintiff's legs where Defendant Hopkins applied the Taser. However considering the totality of the circumstances, the first, third, fourth, fifth and sixth *Kinglsey* factors would weigh in Plaintiff's favor if his version of the events is true, given his affirmation of when and how long the Taser was deployed.

As noted by the Tenth Circuit Court of Appeals, many "[f]ederal courts have held that the use of a [T]aser or similar stun gun is not per se unconstitutional when used to compel obedience by inmates." *Hunter v. Young*, 238 F. App'x 336, 339 (10th Cir. 2007) (unpublished) (collecting cases). "[T]asers are proportional force *only* when deployed in response to a situation in which a reasonable officer would perceive some immediate danger that could be mitigated by using the taser." *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d

892, 903 (4th Cir.) (emphasis in original), *cert. denied sub nom. Vill. of Pinehurst, N.C. v. Estate of Armstrong*, 137 S. Ct. 61, 196 L. Ed. 2d 32 (2016); *see also Sawyer*, 537 F. App'x 283, 292 (4th Cir. 2013) (citation omitted) ("A law enforcement officer is justified in the use of any force which he reasonably believes to be necessary to effect arrest or hold someone in custody and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm."). Given the facts here and viewed in light most favorable to Plaintiff, the Court cannot conclude that Defendant's Hopkins' use of force was objectively reasonable under the circumstances, particularly if Defendant Hopkins continued to deploy the Taser after Plaintiff had been handcuffed and under the control of the officers. While it may be true that Defendant Hopkins' initial use of the Taser to restore order was objectively reasonable, the continued use is still a genuine issue of material fact here because "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005); *see also Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 734 (4th Cir. 2013) (denying summary judgment under the Fourth Amendment excessive force standard by finding that it is "an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a [T]aser on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest"). If under the control of officers, continued use of the Taser would not have been the result of active resistance or any threat posed to the officers. Additionally, at that point, the severity of the security problem would be minimal. In sum, Defendant Hopkins should not be granted

summary judgment as to Plaintiff's excessive force claim.

## Qualified Immunity

Defendants assert that they are entitled to qualified immunity. (Defs.' Br. at 17-18.) Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) ("Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983[.]"). Thus, the traditional two-step qualified immunity inquiry requires a court to determine: "(1) whether the official violated a constitutional right; and if so, (2) whether the right was 'clearly established' at the time of its violation." *Rock for Life-UMBC v. Hrabowski*, 411 Fed. App'x 541, 546-47 (4th Cir. 2010). In evaluating qualified immunity, a court initially may determine whether the plaintiff has alleged or shown a violation of a constitutional right at all. *See Pearson v. Callahan*, 555 U.S. 223 (2009).[6] Further, "[b]ecause qualified immunity is designed to shield officers not only from liability but from the burdens of litigation, its establishment at the pleading or summary judgment stage has been specifically encouraged." *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992).

---

[6] In *Pearson*, the Supreme Court overruled the mandatory two-step sequence adopted in *Saucier v. Katz*, 533 U.S. 194 (2001), in analyzing qualified immunity. Thus, after *Pearson*, courts are free "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances . . . ." *Pearson*, 555 U.S. at 236.

Here, "[t]he fact that pretrial detainees have a Fourteenth Amendment Due Process right to be free from excessive force, which is balanced against the legitimate interests that stem from the government's need to manage the detention facility, has long been clearly established." *Greene v. Cty. of Durham Office of the Sheriff Dep't*, No. 1:14-CV-153, 2016 WL 4507355, at *11 (M.D.N.C. Aug. 26, 2016) (unpublished) (citing *Bell v. Wolfish*, 441 U.S. 520, 538-40 (1979)). Thus, since Plaintiff "has alleged a clearly established right, summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of [Defendants Kempf and Hopkins]." *Buonocore v. Harris*, 65 F.3d 347, 359-60 (4th Cir. 1995). Such is the case here. "Although a jury ultimately may find that the [Defendants'] version of the events is more credible, [the Court is] not permitted to make such credibility determinations when considering whether a [prison official] properly [is] held immune from suit under the doctrine of qualified immunity." *Meyers*, 713 F.3d at 733. In sum, at this juncture, Defendants should not be entitled to summary judgment on qualified immunity grounds. *Greene*, 2016 WL 4507355, at *11 ("While the Court appreciates that the defendants deny [plaintiff's] version of events and that [plaintiff's] version has some serious credibility problems, those disputes are not relevant to the qualified immunity issue, which assumes the truth of the plaintiff's version. The defendants are not entitled to qualified immunity.").

## IV. CONCLUSION

For the reasons stated above, **IT IS HEREBY RECOMMENDED** that Defendants' Motion for Summary Judgment (Docket Entry 30) be **DENIED**.

**IT IS HEREBY ORDERED** that to the extent Plaintiff seeks additional time to obtain discovery responses (Docket Entry 43), the request is **DENIED**.

Joe L. Webster
United States Magistrate Judge

May 26, 2017
Durham, North Carolina